IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v | : | Crim. No. 03-cr-331-14 (CKK) |
| | : | |
| WALDEMAR LORENZANA-CORDON | : | |

DEFENDANT WALDEMAR LORENZANA-CORDON'S
SENTENCING MEMORANDUM

Defendant Waldemar Lorenzana-Cordon, through undersigned counsel, respectfully submits the following Sentencing Memorandum.

I. PRESERVATION OF FIFTH AMENDMENT RIGHT AGAINST SELF-INCRIMINATION

Defendant Waldemar Lorenzana-Cordon did not testify at his trial.[1] He intends to appeal his conviction and the Court's ruling on his port-trial motion for a new trial. Therefore, he retains his Fifth Amendment right against self-incrimination. In order to reserve that right, Defendant, at this time, elects not to make any personal factual representations concerning his case in regards to sentencing.[2] Consequently, Defendant recognizes that the Court must make its sentencing decisions based on the existing record.

That does not mean the Court must accept every assertion by government witness as fact; the Court may consider factors bearing on the witness's credibility

---

[1] Whether this was a knowing waiver, made after full consultation with his then defense counsel is a matter which may be litigated at a later date.

[2] Defendant obviously reserves the right to change his mind about this.

1

as well as the inherent likelihood of the testimony. For example, Sebastiana Cotton's testimony that when she and others met with Defendant Waldemar Lorenzana-Cordon to confront him about the failure to provide a load of cocaine for which she and her associates had paid 3 million dollars, there were 80 to 100 armed men and a helicopter[3] (Tr. 3/8/16 am; 40-41) makes no sense and is contradicted by all of the other testimony as to how Defendant operated. To be sure, it would be expected that each side would approach such a confrontation with caution, even armed, but the testimony was generally that Waldemar Lorenzana-Cordon and his brother, Eliu Lorenzana-Cordon, each had a small number of workers on their ranch. To bring together scores of additional men would be to dramatically expand the number of persons who would potentially learn of their illegal activity, and thus become a potential liability in the future. Had Cotton suggested Waldemar Lorenzana-Cordon had perhaps a dozen additional armed men to confront Cotton's party of six, it would have made more sense.

## II. RELATION TO POST-TRIAL MOTIONS

Contrary to the assertion of the United States, (Govt. Sent. Memo. at 5), Defendant is not seeking to relitigate his post-trial motion for a new trial. Defendant concedes that the jury found that he conspired to import cocaine into the United States and, therefore, that the Court must sentence him for the offense for

---

[3] Indeed Ms. Cotton admitted that she had not known Waldemar Lorenzana-Cordon to possess a helicopter; it was Eliu Lorenzana-Cordon whom she claimed had one. (Tr. 3/8/16 am; 41)

which he was convicted. Nonetheless, Defendant's post-trial motion raised questions as to what *exactly* was the conspiracy with which he was charged. The answer to that legal question necessarily impacts some factual and legal issues related to the factors to be considered under 18 U.S.C. §3553(a). Defendant believes it important to identify when those issues arise in the context of sentencing for purposes of appeal.

III. OBJECTIONS TO SENTENCING GUIDELINES CALCULATION

    A. Use Of Non-Commercial Aircraft To Import

The Presentence Report (PSR) applied a 2 level increase in the offense level under U.S.S.G. §2D1.1(b)(3)(A) because Defendant's "co-conspirators used an aircraft other than a regularly scheduled commercial air carrier to import controlled substance. (PSR ¶ 28). The PSR apparently based this increase on the conclusion that (t)he DTO also utilized cocaine-laden aircraft which landed on clandestine airstrips located on or near properties owned and/or utilized by the DTO. (PSR ¶ 10). Defendant objects to this increase because there is no evidence that any non-commercial aircraft were used to import the cocaine *into the United States.* Merely moving the cocaine by private plane from one foreign country to another does not trigger the enhancement absent importation into the United States. *United States v. Joelson,* 7 F.3d 174, 179-180 (9th Cir. 1993); *cert denied,* 510 U.S. 1019 (1993) (cocaine flown into Guatemala on a private plane which was not a "regularly

scheduled commercial air carrier," but was flown into the United States on a commercial Pan Am flight; the enhancement (under then U.S.S.G. §2D1.1(b)(2)) did not apply). *See also, United States v. Chastain,* 198 F.3d 1338, (11th Cir. 1999); *cert denied. sub nom Morris v. United States,* 532 U.S. 996 (2001) (defendants intended to import cocaine from Jamaica into the United States, but were arrested before they could make that trip; the enhancement did not apply as no actual importation had occurred).

Although the Sentencing Guideline provision does not use the words "into the United States," it is the logical conclusion that the Commission was simply being brief. U.S.S.G. §2D1.1 applies to "Unlawful Manufacturing, **Importing**, Exporting or Trafficking (as well as related possession with intent to distribute, attempt and conspiracy offenses). The Statutory Provisions section of the Commentary refers to 21 U.S.C. §960(a)(b) which contains a list of the relevant importation statutes,[4] all of which specifically refer to importation into the United States or its customs waters.

---

[4] They include (1) 21 U.S.C. §952 - importing controlled substances into the United States and its customs territory, (2) 21 U.S.C. §§955  - possessing controlled substance on board a vessel arriving in the United States or its custom territory, (3) 21 U.S.C. §§957(a) - importing controlled substances into the customs territory of the United States without proper registration, and  (4) 21 U.S.C. §§959(a) – distributing cocaine intending, knowing or having reasonable cause to believe it will be unlawfully imported into the United States or within 12 miles of the coast.

4

B. Enhancement For Leadership Role

The PSR applied a 4 level increase in the offense level under U.S.S.G. §3B1.1(a) because it concluded that Defendant "was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive. (PSR ¶ 30). Defendant opposes this enhancement on two grounds. First, Defendant contends that no enhancement for an aggravating role in the offense is legally permissible because there is no evidence that Defendant supervised a "participant" in the conspiracy. Secondly, Defendant contends that if the charged conspiracy is properly considered, any enhancement would at most be one of a supervisor or manager.

1. Requirement of a "Participant"

### a. The Legal Requirement

Of the factors listed in U.S.S.G. §3B1.1 App. Note 4, "the degree of control and authority exercised over others" is perhaps the most important as "(a)ll persons receiving an enhancement [under §3B1.1] must exercise some control over others," *United States v. Smith*, 374 F.3d 1240, 1250 (D.C. Cir. 2004) (citing *United States v. Graham*, 162 F.3d 1180, 1185 (D.C. Cir. 1998)). Thus, control over others is a **necessary, but not necessarily sufficient**, basis to apply the enhancement. *See, id.* at 1184. The enhancement does not apply simply because a person's role may have been "essential" to the criminal activity. *Id.* at

5

1185.

At least one person over whom a person exercises control must be a "participant," which U.S.S.G. §3B1.1 App. Note 1 defines as "a person who is criminally responsible for the commission of the offense, but need not have been convicted." *See*, *United States v. Kelley*, 36 F.3d 1118, 1129 (D.C. Cir. 1994). To be a "participant, the other person be one who "commit[s] all of the elements of a statutory crime *with the requisite mens rea*," *United States v. Brodie*, 524 F.3d 259, 271 (D.C. Cir. 2008) (citing *United States v. McCoy*, 242 F.3d 399, 410 (D.C. Cir. 2001). *Accord, United States v. Bapack*, 129 F.3d 1320, 1325 (D.C. Cir. 1997), which in the case of the statute in this case, with its extraterritorial jurisdiction, logically means the other "participant(s)" knew or intended that there was cocaine intended for the United States.[5] The enhancement does not apply simply based on the control of innocent or unknowing persons, *McCoy*, *supra*.

### b. Burden Of Proof

As the Court of Appeals in *Bapack*, 129 F.3d at 1324, noted:

> At sentencing, it is the Government's burden to demonstrate by a fair preponderance of the evidence that an enhancement is warranted. *See, United States v. Cruz,* 120 F.3d 1,2 (1st Cir. 1997) (*en banc*). Thus, to support an aggravating role enhancement, the

---

[5] The Court of Appeals correctly noted that the *mens rea* of the "participant" need not be ***exactly*** the same as that of the defendant, *United States v. Martinez-Vega,* 826 F.3d 514, n.9 at 539 (D.C. Cir. 2016); *cert. denied* ___U.S._, 137 S.Ct. 1238 (2017)., (quoting *Bapack*, at 129 F.3d at 1325.) However given that neither Defendant nor any workers he may supervised appeared to ever have entered the United States, the ***only*** statutory crime at issue was the charged conspiracy to import the cocaine into the United States.

6

> Government must show that more likely than not the defendant organized, led, managed or supervised the crime.

This means that, unlike the standard of review for a motion for a judgment of acquittal, the evidence is **not** reviewed in a light most favorable to the government. The Court is permitted to consider factors directly affecting the credibility of the government witnesses. This would include the witnesses' motive to testify on behalf of the government, and the inconsistencies between the trial testimony upon which the government relies and the statements which they made when first questioned by law enforcement.

### c. Factual Record

As the owner of a ranch, Defendant naturally supervised individuals who worked on the ranch. Bryon Linares testified he was aware of only two or three "indigenous" people. (Tr. 2/24/16 a.m.: 74.) He also testified that he only dealt directly with Waldemar Lorenzana-Cordon, not any subordinate. *Id.* None of the transcript pages cited by the government at page 13 of its Sentencing Memorandum support the claim that Waldemar Lorenzana-Cordon had an "arsenal" of workers. Assuming *arguendo* some of these individuals were directly involved in transporting the cocaine onto the ranch, storing it securely, and later assisting in having it transported off the ranch, that does not demonstrate that any of them **knew** that the cocaine was destined for the United States. In light of the jury's verdict, Defendant concedes that Court must accept

7

that Defendant knew the cocaine was going to the United States, but Defendant never directly shipped any cocaine to the United States; he was alleged to have sold it to various Mexican customers who assumed responsibility from that point on. There is no evidence that Defendant ever discussed with his workers what his Mexican customers intended to do with the cocaine, assuming that he knew himself. Otto Herrera testified that he never had such conversations with Waldemar Lorenzana-Cordon's workers. (Tr. 3/3/16 p.m. at 67) Moreover, there is no logical reason to assume that Waldemar Lorenzana-Cordon would have shared any such information with persons who were his employees as there was no need for them to know such information, and it would indeed increase security risks to unnecessarily disseminate it.

The United States identifies three subordinates whom it asserts Waldemar Lorenzana-Cordon "shared oversight for" – Guasha, Luisito, and Rigo Salguero. (Govt. Sent. Memo. at 12). However, the evidence demonstrates these three persons all worked for *Eliu* Lorenzana-Cordon, a fact the prosecutor explicitly recognized in closing argument. (Tr.3/16/16/ a.m.: 30)[6] The government's claim that Waldemar Lorenzana-Cordon "shared oversight" with the three men comes from the testimony of Marllory Chacon.

---

[6] This admission was appropriate as virtually every witness identified the three men as Elio's workers. For example, when counsel for Waldemar Lorenzana-Cordon asked Otto Herrerra about Guasha as a worker of *Waldemar* Lorenzana-Cordon, Herrera corrected him to clarify that Guasha was *Eliu* Lorenzana-Cordon's worker. (Tr. 3/3/16p.m.: 47)

8

Unlike every other witness, Chacon testified that Eliu Lorenzana-Cordon and Waldemar Lorenzana-Cordon worked together on individual loads of cocaine.[7] She testified that she initially approached Waldemar Lorenzana-Cordon through his wife, but he in turn contacted Eliu Lorenzana-Cordon. (Tr. 3/14/16 p.m.: 47). The meetings were conducted at Eliu Lorenzana-Cordon's house and Guasha, Luisito, and Rigo Salguero were also present. (Tr. 3/14/16 p.m.: 48) According to Chacon, Waldemar Lorenzana-Cordon did not make the specific plans, but was "always ready to do whatever his brother decided." (Tr. 3/15/16 a.m.: 22-23). Chacon never testified that Waldemar Lorenzana-Cordon gave orders to the other men, or that he was given authority by Eliu Lorenzana-Cordon to direct the other three men. Indeed, on the one occasion when Chacon heard what each individual was to do, Waldemar Lorenzana-Cordon was given the job of collecting the cocaine while Luisito and Guasha were to collect the money. (Tr. 3/14/16 p.m.: 52). Although Chacon seemed to view the three men to be workers of both defendants, that may have been because she saw the three men in the company of both defendants at Eliu Lorenzana-Cordon's house. The fact that Waldemar Lorenzana-Cordon worked with the other men on projects which his brother arranged and decided upon, does not mean that he could

---

[7] Otto Herrera testified that he parceled out extra cocaine from shipments to the brothers separately. Ms. Cotton testified that she worked separately with each brother, and Waldemar Lorenzana-Cordon had no dealings with government witnesses Walter Montejo and David Andrade.

9

"control" the three men.

### d. Willful Blindness

The government has suggested in other cases that persons who may have aided a defendant in transportation activities could possess the requisite *mens rea* as a result of "willful blindness." Since the government gets the last word under the Court's schedule, Defendant addresses the issue preemptively. The United States Supreme Court described the concept of willful blindness in *Glob.-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 769–70 (2011):

> While the Courts of Appeals articulate the doctrine of willful blindness in slightly different ways, all appear to agree on two basic requirements: (1) the defendant must subjectively believe that there is a high probability that a fact exists and (2) the defendant must take deliberate actions to avoid learning of that fact. We think these requirements give willful blindness an appropriately limited scope that surpasses recklessness and negligence. Under this formulation, a willfully blind defendant is one who takes deliberate actions to avoid confirming a high probability of wrongdoing and who can almost be said to have actually known the critical facts. See G. Williams, Criminal Law § 57, p. 159 (2d ed. 1961) ("A court can properly find willful blindness only where it can almost be said that the defendant actually knew"). By contrast, a reckless defendant is one who merely knows of a substantial and unjustified risk of such wrongdoing, see ALI, Model Penal Code § 2.02(2)(c) (1985), and a negligent defendant is one who should have known of a similar risk but, in fact, did not, see § 2.02(2)(d).
>
> The test applied by the Federal Circuit in this case departs from the proper willful blindness standard in two important respects. First, it permits a finding of knowledge when there is merely a "known risk" that the induced acts are infringing. Second, in demanding only "deliberate indifference" to that risk, the Federal

> Circuit's test does not require active efforts by an inducer to avoid knowing about the infringing nature of the activities.

It is difficult to imagine what "deliberate" actions a simple ranch hand tasked to help move suspected drugs to and within a ranch would have been expected to take to ascertain, if even possible, where a load of suspected cocaine was ultimately headed. Such an inquiry would be unnecessary to the performance of his limited duties, and in many circumstances would be a dangerous inquiry to make in the first place.

### 2. Which Conspiracy?

Defendant continues to argue that the appropriate conspiracy to evaluate his role is the charged conspiracy which encompassed only the Otto Herrera Drug Trafficking Organization. Defendant further asserts that he was not an organizer or leader of such a conspiracy.

The Lorenzana brothers were described as his "subcontractors" by Otto Herrera-Garcia, (Tr. 3/2/16 pm.: 66). Their role was to provide secure places to store cocaine brought in directly or indirectly into Guatemala from Colombia. The Colombian suppliers informed Otto Herrera-Garcia how much of a given shipment was intended for the Sinaloa Cartel; this would average about 60%. This cocaine would be segregated and sorted until ready for pick up. The Lorenzana brothers were paid a fee by Otto Herrera-Garcia for their services (Tr. 3/2/16 am.: 28-30). The Lorenzana brothers were also allowed to purchase any "excess" cocaine for

sale to their own customers; they received no special discount, paying Otto Herrera-Garcia the going rate for cocaine in Guatemala (Tr. 3/1/16 pm.: 69). Moreover, Otto Herrera-Garcia actually directed the brothers to share the loads so as to maximize sales (Tr. 3/2/16 am.: 74).

Waldemar Lorenzana-Cordon exercised no operational control over any of the subordinates of Otto Herrera-Garcia. The grand jury did not indict any of his subordinates. Nor did the grand jury indict any of his customers. He had no personal meetings with either Phanor Aristazabaleta or his family, Herrera-Garcia's identified sources of cocaine, nor with Mayo Zambada or his son, Herrera-Garcia's Sinoloa cartel customers. This was the sole responsibility of Otto Herrera-Garcia and his subordinates.

For these reasons, Defendant submits that, even assuming *arguendo* that he is found to have supervised any "participant," he does not merit a four level increase pursuant to U.S.S.G. §3B1.1(a).[8]

IV. OBJECTIONS TO THE GOVERNMENT'S FACTUAL ASSERTIONS

In Defendant's view the government plays "fast and loose" with the antecedents used in its factual analysis, blending references to Waldemar Lorenzana-Cordon individually, to his brother, and to his alleged co-conspirators. Notwithstanding the legal principle co-conspirator liability, one of the bedrock

---

[8] Defendant does not contend that he merits a ***reduction*** in his offense level pursuant to U.S.S.G. §3B1.2.

principles of federal sentencing has been that sentencing should consider the particular individual to be sentenced and that "one size does not fit all." As the Supreme Court noted in *Pepper v. United States,* 562 U.S. 476, 487–88 (2011):

> "It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Koon v. United States,* 518 U.S. 81, 113, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996). Underlying this tradition is the principle that "the punishment should fit the offender and not merely the crime." *Williams,* 337 U.S., at 247, 69 S.Ct. 1079; see also *Pennsylvania ex rel. Sullivan v. Ashe,* 302 U.S. 51, 55, 58 S.Ct. 59, 82 L.Ed. 43 (1937) ("For the determination of sentences, justice generally requires consideration of more than the particular acts by which the crime was committed and that there be taken into account the circumstances of the offense together with the character and propensities of the offender").

*See also, See, United States v. Childress*, 58 F.3d 693, 722 (D.C. Cir. 1995):

> Because only that conduct of co-conspirators that is "in furtherance of" the conspiracy that the defendant has joined may be attributed to the defendant, proper attribution requires analysis of the scope of the conspiracy that the defendant has joined—the scope of his conspiratorial agreement. The scope of a defendant's conspiratorial agreement, in turn, depends on analysis of the sort we have engaged in above: First, does the evidence establish a single conspiracy, in which each defendant has joined in the overall scheme, or multiple conspiracies involving separate agreements; and second, are there any "side deals" by co-conspirators that are not attributable to the conspiracy joined by the defendant?
>
> Once it is ascertained that co-conspirators' conduct is in furtherance of the conspiracy to which the defendant agreed, the next question is whether that conduct was reasonably foreseeable to the defendant. Because we can only determine whether drug transactions entered into

> by co-conspirators were reasonably foreseeable to the defendant by examining the degree of the defendant's own involvement in and knowledge of the conspiracy, this assessment depends on "factual findings regarding reasonable foreseeability as it relates to each appellant's conspiratorial participation." *Anderson,* 39 F.3d at 331, 353; *see also United States v. Edwards,* 945 F.2d 1387, 1393–94 (7th Cir.1991).

This analysis requires particularized findings about both the scope of the agreement that the defendant entered into and the basis on which it finds the amount of drugs reasonably foreseeable to that individual defendant.

Thus in determining what conduct of others merit increased punishment for Defendant under a 21 U.S.C. §3553(a) analysis, care should be taken to specify what it was Waldemar Lorenzana-Cordon *actually* did or specifically agreed to. In this regard, the government vastly overstates his role, frequently confusing him with his brother.

For example, the government asserts that **Waldemar** Lorenzana-Cordon "authoriz[ed] the construction of a laboratory on his property to refine lower-quality arriving cocaine shipments.( [Govt. Sent. Memor at 14). This is wrong. It was **Eliu** Lorenzana-Cordon who set up the laboratory with Otto Herrera's help. (Tr. 3/2/16 a.m.: 78-90).

As another example, the government asserts at page 10 of its Sentencing Memorandum that **Waldemar** Lorenzana-Cordon "coordinated aerial cocaine shipments on aircrafts such as Piper Navajos and Cessnas that would land and be

14

unloaded at family properties such as La Melonera, La Calera, and Los Conejos, before be (sic) transported to other family properties for storage, including the defendant's ranch at La Finquita." This is false. None of the cited transcript pages refer to Waldemar Lorenzana-Cordon as being anything more than a lookout on one occasion.

The government also misstates the testimony when it asserts that, during the admittedly tense confrontation over the missing 3 million dollars worth of cocaine that **Waldemar Lorenzana-Cordon** pointed a gun at Cotton and touched it every time she moved her chair. [Govt. Sent. Memo at 9] Cotton testified that it was Waldemar Lorenzana-Cordon's associate, "Don Juancho" who did this. (Tr. 3/8/16 a.m.: 43)

V. AN ANALYSIS OF 21 U.S.C. §3553(a) FACTORS

    A. Defendant's Background

If the government's evidence is to be believed, Waldemar Lorenzana-Cordon played a significant intermediate role in the shipment of large quantities of cocaine from Colombia to Mexico and on to the United States. Contrary to the Colombian cartels on the production end and the Mexican cartels on the receiving end, Defendant participated in no acts of violence. (Compare David Andrade who admitted killing two men. (Tr. 3/10/16 p.m. 24-25).) Even the tense confrontation with Cotton did not lead to violence. While Defendant profited from his illegal

dealings, much of the money he received went towards his expenses, including buying cocaine from the Colombians and paying for the transportation to Guatemala.

As an individual, Waldemar Lorenzana-Cordon is a 52 year old man with health problems not atypical for men his age. He also suffered a serious head injury as a young man. Although he comes from a fairly wealthy family for Guatemala, he has no meaningful education. Should the Court impose the mandatory minimum sentence of 10 years, he will be roughly 60 years old. Obviously the longer the sentence, the more deeply into old age the sentence will last. Because of his status as a deportable alien, he is unlikely to be eligible for compassionate medical release as his health problems worsen.

B. Disparity Of Sentences

Although the government fails to mention it among the factors the Court must consider at sentencing, one such factor is "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of the similar conduct." 18 U.S.C. §3553(a)(6). The PSR asserts the information about Defendant's codefendants is "unavailable." (PSR ¶ 19). Presumably the Court has greater awareness, but the Court docket indicates that Byron Linares got only 84 months, and Otto Herrera less than 10 years. While Defendant concedes that their cooperation with the government earned them a

substantially lesser sentence, Defendant submits his sentence should not be three to four times as long, given the roles that both men played in comparison to the Defendant.

## VI. INABILITY TO PAY A FINE

The PSR asserts that Defendant has failed to prove that he lacks the ability to pay a fine. The PSR reports that "(u)pon the advice of defense counsel, the defendant declined to provide information concerning his finances. (PSR ¶¶ 55, 56). It is true that, because Defendant still possesses a Fifth Amendment right not to incriminate himself, that counsel advised that he not discuss property he may have owned in Guatemala. However, Defendant signed consent forms for any records in the United States. Defendant is facing a lengthy period of incarceration in the United States, up to life if the government had its way. He has no ability, nor will he in the foreseeable future to control any assets in Guatemala. Thus, Defendant asserts, he does not have the ability to pay a fine.[9]

## VII. *SMITH* DEPARTURE

Should the Court impose less than life, Defendant also requests that the Court consider a six month departure under *United States v. Smith,* 27 F.3d 649 (D.C. Cir. 1994).

---

[9] If the Court were to impose the mandatory minimum sentence of 10 years, Defendant agrees that a fine as part of supervised release might be appropriate.

## VIII. RECOMMENDATION TO THE BUREAU OF PRISONS

Defendant requests that this Court recommend to the Bureau of Prisons that he be held in the same facility with his brother and codefendant Eliu Lorenzana-Cordon. Counsel will consult with counsel for his brother and attempt to make a joint request for the Court's specific recommendation by time of sentencing.

Respectfully submitted

/s/

Richard K. Gilbert
Bar. No. 939884
100 "M" Street, S.E.
Suite 600
Washington, D.C.  20003
(202) 749-8627
rkgesq@juno.com

Attorney for Defendant
    Waldemar Lorenzana-Cordon